UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

RICK MASDEN,

          Plaintiff,

    vs.

RISENHOOVER, et al.,

          Defendants.

Case No:  C 09-5457 SBA (pr)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Docket 73, 100, 120, 121

      In March 2002, Plaintiff Rick Masden arrived at Pelican Bay State Prison ("PBSP"), and was diagnosed in 2005 as having the Hepatitis C virus ("HCV").  Compl. ¶¶ 20, 29, Dkt. 1.  He brings the instant pro se civil rights case under 42 U.S.C. § 1983 alleging that various Defendants were deliberately indifferent to his serious medical needs with respect to their treatment and care of his condition.  Plaintiff brings individual liability claims against PBSP Family Nurse Practitioners Sue E. Risenhoover and M. McLean, Drs. Michael Sayre, Claire P. Williams and W. Wahidullah, and Registered Nurse Donna K. Alpaugh; and supervisory liability claims against Dr. Sayre and Nurse McLean.

      The parties are presently before the Court on Defendants' Motion for Summary Judgment.   Dkt. 73.[1]  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANT IN PART and DENIES IN PART the motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

---

      [1] All Defendants, except for Dr. Wahidullah, bring the instant motion.  Dr. Wahidullah was served after the motion was filed.

I.        **BACKGROUND**

A.        OVERVIEW OF **PBSP** GUIDELINES FOR **HCV** INMATES

HCV is a slow-progressing infectious disease that can lead to cirrhosis of the liver. Sayre Decl. ¶ 13, Dkt. 74.  When cirrhosis becomes very severe, the liver is unable to function properly.  Id. ¶ 14.  This condition, called decompensated cirrhosis or advanced or end-stage liver disease, is marked by varices, ascites, jaundice, or low platelets.  Id.[2]  A patient in that condition cannot safely receive anti-viral therapy (also known as combination therapy).  Id.

The California Department of Corrections and Rehabilitation ("CDCR") has implemented a protocol for the treatment of inmates with HCV in the form of HCV Chronic Care Guidelines ("Guidelines").  Id. ¶ 7 & Ex. E (copy of Guidelines in effect from May 2004 to September 2009).  Id.  The Guidelines were developed in connection with Madrid v. Cate, No. C 90-3094 TEH (N.D. Cal. Oct. 26, 1990), a class action lawsuit brought by a prisoner rights advocacy group to address various issues relating to the conditions of confinement at PBSP, including the provision of medical care for inmates. MED 2336-2358.[3]  The 2004 Guidelines were revised in February 2005, January 2006, April 2008, and September 2008.  Sayre Decl. ¶ 7.

The development of the Guidelines was overseen by a Special Master appointed by the Honorable Thelton E. Henderson of this Court, and resulted from a series of meetings

---

[2] Ascites is an accumulation of fluid in the abdominal cavity, often caused by cirrhosis.  Sayre Decl. ¶ 15.  Varices are extremely dilated veins.  Id. ¶ 16.  In the case of cirrhosis, dilation of veins will occur in the lower end of the esophagus where it joins the stomach, and at the anus in the form of hemorrhoids.  Id.  These conditions are caused by blocked blood flow from the digestive system, which normally would go through the liver, attempting to reach the systemic circulation.  Id.  The resulting high blood pressure in the digestive system blood flow is called portal hypertension.  Id.  Bleeding from esophageal varices is the most common cause of death in patients with cirrhosis and end stage liver disease.  Id.  Plaintiff suffered from liver damage resulting in cirrhosis, portal hypertension, and varices, all caused by HCV.  Id. ¶ 17.  Plaintiff is infected with HCV genotype 1a, which is the most resistant to antiviral treatment.  Sayre Decl. ¶ 11.

[3] The medical records proffered by Defendants are attached to the Declaration of Dr. Michael Sayre, the Chief Medical Officer at PBSP.  For simplicity, references to those records will be denoted by "MED xxxx."

and discussions involving a panel of HCV physician experts, Court-appointed experts and the parties in the <u>Madrid</u> case.  Defs.' Request for Judicial Notice ("RJN"), Ex. B at 3-4, Dkt. 77-2.  The Special Master noted that the review process "far exceeded" the standard of review set by the Court and entailed "careful scrutiny of the most minute details of HCV care."  <u>Id.</u>  The Guidelines, with the agreement of the parties and the Special Master, were approved by Judge Henderson on June 1, 2004.  RJN, Ex. A, Dkt. 77-1.  Since the beginning of the HCV program at PBSP, over 4,000 inmates have been diagnosed with or treated for HCV.  Alpaugh Decl. ¶ 10, Dkt. 76.

The Guidelines set forth three Phases:  (1) "Phase I:  Screening and Initial Diagnosis"; (2) "Phase II:  Initial Management After Diagnosis of HCV"; and (3) "Phase III:  Staging by Liver Biopsy and Combination Therapy."  MED 2386-2387, Dkt. 74-13; MED 2388-2391, Dkt. 74-14.  In Phase I, HCV screening is provided to any inmate-patient, upon request.  MED 2386.  If the inmate tests positive for the presence of HCV antibodies, "the viral presence [is] checked by the qualitative polymerase chain reaction (PCR) test followed by a reflex quantitative test . . . ."  <u>Id.</u>  The inmate's primary care provider must notify the inmate of his or her test results, and is to conduct a face-to-face meeting in the event of a positive test result.  <u>Id.</u>  Once the inmate is notified of a positive test result, the inmate proceeds to Phase II, and Phase I is deemed to have been completed.  <u>Id.</u>  The Guidelines specify that "[t]he anticipated time period for an inmate-patient to complete Phase I is three (3) months."  <u>Id.</u>

Phase II of the Guidelines provide that a patient with a positive PCR test result is to be followed in the HCV Clinical Management Program.  MED 2387.  Qualifying patients may undergo a liver biopsy to test liver function in tandem with antiviral treatment (also

known as combination therapy).  MED 2387; Sayre Decl. ¶ 24.[4]  Inmates 45 years-old and younger are required to have three separate liver enzyme alanine aminotransferase ("ALT") tests performed one month apart; if the ALT levels are elevated to less than two-times normal for all three consecutive tests, combination therapy is not indicated.  Id.  A "normal" ALT result is below 60 units per liter of blood.  Sayre Decl. ¶ 30.  Inmates older than 45 years-old are not required to have elevated ALT test results to qualify for combination therapy.  MED 2387.  Aside from those patients who are 45 years-old and under who do not qualify for combination therapy, the anticipated time period to complete Phase II is two months.  MED 2388-2389.

At Phase III, inmates being considered for a liver biopsy have their cases reviewed by the HCV Committee, which is a subset of the Utilization Management ("UM") Committee (also referred to as the Medical Authorization Review ("MAR") Committee).  MED 2389; Sayre Decl. ¶¶ 8-10.  The HCV Committee, which is comprised of the practicing medical professionals at the prison, including doctors, family nurse practitioners and physician assistants, discusses treatment plans for inmates with HCV, and whether treatment should be adjusted or discontinued.  Sayre Decl. ¶ 8.  If a PBSP medical practitioner believes that a certain procedure is needed or desires review of an ongoing treatment plan, the case is referred to the UM Committee.  Id. ¶¶ 9, 10.  These committees review the individual case and either approve or deny the request.  Id. ¶ 9.

---

[4] A liver biopsy is an invasive procedure that requires inserting a needle into the liver and removing a small slice of the liver to assess the extent of liver damage.  Sayre Decl. ¶ 20.  The decision of whether to administer a liver biopsy is made on an individualized basis, particularly since patients prone to bleeding could suffer internal bleeding which may result in death.  Id. ¶ 21-23.  Many HCV patients are at risk of internal bleeding, due to varices in the esophagus, and a low level of blood platelets, which are necessary to stop bleeding.  Id. ¶ 23.  A liver biopsy is often discussed together with antiviral treatment because performing a biopsy before giving antiviral treatment can provide a baseline to compare liver damage after antiviral treatment.  Id. ¶ 24.  Combination therapy is contraindicated in the Guidelines in various circumstances, such as decompensated cirrhosis.  Id. ¶ 29.

### B.   PLAINTIFF'S DIAGNOSIS AND TREATMENT

#### 1.   Diagnosis

Plaintiff entered PBSP on March 8, 2002.  MED 2155.  Upon his arrival, Plaintiff was medically screened, and at that time, denied having any history of hepatitis.  MED 2159.  As part of the initial screening process, Dr. Wolff, who is not a party to this action, ordered a hepatitis panel to test him for HCV, but the test was never completed.  Compl. ¶ 22.  Defendants indicate that Plaintiff refused to be tested.  MED 2166 (Refusal of Examination or Treatment Form for Plaintiff, dated March 28, 2002).  Plaintiff claims that he "did not refuse his labs."  Masden Decl. ¶ 5, Dkt. 119.

The first mention of hepatitis in Plaintiff's medical record appears in a June 14, 2005 medical progress report.  MED 1062.  In that note, Nurse Risenhoover, Plaintiff's primary care provider from 2005 to 2009, reported that Plaintiff had stated:  "I want my blood work updated, checked for hepatitis. . . . I had blood exposure from fights [in] 1999."  Id. Plaintiff also stated that he wanted "that new drug for hepatitis."  Id.  Nurse Risenhoover ordered a hepatitis panel, and the June 29, 2005 test results showed that Plaintiff had a positive qualitative result for the HCV antibody.  Risenhoover Decl. ¶ 8, Dkt. 75; MED 1251.

On July 6, 2005, Nurse Risenhoover completed a form entitled "Notification to Patient of Laboratory Results" which informed Plaintiff that his hepatitis panel was not "within normal limits" and that he would "be scheduled to discuss the results with a physician."  MED 1252.  It is unclear when this form was provided to Plaintiff, if at all.

On November 29, 2005, Nurse Risenhoover saw Plaintiff for an unrelated issue in response to a sick call slip.  In her progress note from the visit, she indicated that Plaintiff had stated to her that:  "I also got notice on some lab work back in June and I would like to talk about it.  I was supposed to be called in."  Masden Decl. ¶ 11 & Ex. B-1.

The June 2005 positive result for HCV antibody only indicated that Plaintiff had HCV antibodies in his blood.  Risenhoover Decl. ¶ 8.  As noted, Phase I of the Guidelines requires that a positive HCV antibody test be followed by a quantitative test to measure the

HCV viral load.  MED 2386; Risenhoover Decl. ¶ 8.  Thus, on December 8, 2005, Nurse Risenhoover ordered liver function and viral load tests for Plaintiff.  MED 1248-1250.  The test results indicated that Plaintiff's ALT level was 94, whereas a normal ALT level is 60.  MED 1248.

On December 13, 2005, Nurse Risenhoover completed a Notification to Patient of Laboratory Test Results Form on which she checked a box at the top indicating:  "Your tests result is essentially within normal limits.  No physician follow-up is required."  MED 1250.  In the "remarks" section of the form, however, Nurse Risenhoover handwrote that Plaintiff had "abnormal elevations" of AST (83), T. Bilirubin (2.1) and ALT (83).  She noted that "all other function normal" and that she would discuss the results with him at his next appointment.  Id.

On January 9, 2006, Nurse Risenhoover saw Plaintiff and discussed his lab results with him.  MED 1044, 1247.  Nurse Risenhoover's January 9, 2006 progress note indicates that Plaintiff stated, "I was real sick in county jail, I am sure my liver was elevated then, I want my hep c tx now before it gets worse.  I want a liver biopsy."  MED 1042.[5]  Nurse Risenhoover's plan for Plaintiff was to enroll him into the Hepatitis C Chronic Care program, renew his Naprosyn (anti-inflammatory medicine), and refer him to physical therapy.  MED 1044.

### 2.    Treatment

Although the December 8, 2005 test showed that Plaintiff had an elevated ALT level, he was not eligible for combination therapy under the Guidelines because he was under forty-six years old and his ALT level was not twice normal.   Sayre Decl. ¶ 30.  Although the Phase I Guidelines specify that "[a] repeat ALT level shall be obtained *one month after initial testing* if the patient is 45 years old or younger and the initial ALT level was less than two (2) times the normal laboratory value," MED 2387 (emphasis added),

---

[5] A second Notification to Patient of Laboratory Test Results Form issued on the same date indicates that Plaintiff's test results were "not" within normal limits and stated that "You are scheduled to discuss the results with a physician."  MED 1247.

Plaintiff's next liver function test did not take place until May 2, 2006.  MED 1244-45.
The May 2 test showed an ALT level of 95, meaning that Plaintiff still did not qualify for
combination therapy under the Guidelines, even though he had ongoing symptoms of
headaches, cold sweats, nausea, insomnia and tiredness.  Masden Decl. ¶¶ 36-37.

On July 25, 2006, Nurse Risenhoover saw Plaintiff for a follow-up visit and
discussed with him the results of his June 9, 2006 liver function test, which showed an ALT
level of 62.  MED 975.  Between December 2005 and September 2009, Plaintiff received
twenty-two liver function tests, MED 2087, and continued to receive treatment for issues
related to his HCV.  Sayre Decl. ¶ 12.  Between December 2005 and October 2007,
Plaintiff's ALT levels stayed below 120, the level required before combination therapy
could be prescribed under the Guidelines.  MED 2087.

On July 3, 2007, Plaintiff was referred for an x-ray of his upper GI and small
bowels.  Id. ¶ 40, Ex. K-5.  The x-ray revealed "enormous splenomegaly."  Ex. K-5.  On
July 16, 2007, Nurse Risenhoover referred Plaintiff for a CT scan which showed a massive
splenomegaly and numerous large varices consistent with severe pulmonary arterial
hypertension.  Id., Ex. K-6.

On July 27, 2007, Nurse Risenhoover and Dr. Sayre reviewed Plaintiff's medical
treatment and chose not to refer him for antiviral treatment because he was 44 years-old
with ALT levels lower than twice normal.  MED 835-39; Defs.' Ex. D at 9.  On August 7,
2007, the UM Committee, which reviews treatment plans, denied Plaintiff's request for
combination therapy.  MED 1293.   In Nurse Risenhoover's referral of Plaintiff's request to
the UM Committee, she described him as a patient with "end stage liver disease."  Id.

On November 27, 2007, Plaintiff's ALT level reached 135.  MED 2087.  Plaintiff
received a copy of this test result on December 3, 2007, which he discussed with Nurse
Risenhoover on January 9, 2008.  MED 1200, 780-82.  Between November 27, 2007 and
March 6, 2008, Plaintiff's ALT levels stayed above the requisite level of 120 needed for
antiviral treatment and/or a liver biopsy.  MED 2087.  Despite Plaintiff's elevated ALT
levels, Nurse Risenhoover did not prescribe a liver biopsy or antiviral treatment.  The

Guidelines and protocol for treating inmates with HCV indicate that antiviral treatment and/or a liver biopsy would be too dangerous given that Plaintiff showed symptoms of bleeding, varices, and a low platelet level.  MED 762, 2394.

On January 16, 2008, the UM Committee denied Plaintiff's request for a CT scan and abdominal ultrasound as not medically indicated.  MED 777.

On February 7, 2008, Plaintiff informed Nurse Risenhoover that he had vomited blood.  MED 154.  On February 7 and March 6, 2008, Nurse Risenhoover ordered that Plaintiff's vomit be "guiaced" to look for blood, based on her concern that he might be bleeding internally.  MED 152, 154.  Nurse Risenhoover noted all of Plaintiff's symptoms that contraindicated combination therapy.  MED 786.

On May 8, 2008, Nurse Risenhoover reviewed Plaintiff's case with Dr. Sayre and they decided there would be no change in Plaintiff's treatment plan.  MED 150; Def.'s Ex. D at 11.

On February 24, 2009, Dr. Williams placed a request to the UM Committee that Plaintiff undergo a liver biopsy and HCV treatment.  MED 124, 541-542; Ex. D at 18.  The UM Committee denied the request on March 17, 2009.  MED 1289.

### 3. Plaintiff's Diet

The Guidelines suggests that only those patients with HCV who are unable to obtain sufficient nutrition from the prison's heart healthy diet are entitled to a hepatic (low protein) diet.  MED 2393.  On April 12 and July 19, 2006, Nurse Risenhoover and Dr. Sayre denied Plaintiff's request for a hepatic diet on the ground that he did not meet the Guidelines' requirements for receiving such a diet.  MED 178, 970.

On August 8, 2006, Nurse Risenhoover referred Plaintiff's diet request to the MAR Committee.  MED 931.  On August 21, 2006, the MAR Committee found that Plaintiff did not meet the requirements for a special hepatic diet and determined that "the heart healthy diet has sufficient calories and content to allow patient to make choices and deletions."  MED 955.  On August 30, 2006, during the course of a medical visit, Defendant Nurse Risenhoover explained the MAR Committee's determination to Plaintiff.  MED 959.

However, on August 6, 2007 and February 7, 2008, Nurse Risenhoover prescribed the hepatic diet for Plaintiff.  (MED 785; 820).

In April 2008, the Guidelines regarding hepatic diets were revised to allow such a diet to be prescribed only to patients who were experiencing encephalopathy, a condition characterized by disorientation and sleepiness caused by an accumulation of metabolic byproducts in the blood that would normally be removed by the liver.  MED 746; 2490. During a May 8, 2008 medical appointment with Plaintiff, Nurse Risenhoover explained to him that he would no longer be prescribed a hepatic diet because he was not experiencing encephalopathy.  MED 150.  Nurse Risenhoover was prescribing lactulose, a laxative, for Plaintiff to prevent encephalopathy by assisting the removal of toxins from his body.  MED 44; Risenhoover Decl. ¶ 11.  Plaintiff states that he was experiencing symptoms indicating that he had encephalopathy and he cites a treatment note from HCV specialist Dr. Martinelli that diagnosed Plaintiff with encephalopathy, treated with lactulose, and ordered a hepatic diet.  Masden Decl. ¶ 49; Pl.'s Ex. R-33-34.

On May 20, 2008, the Hepatitis C Oversight Committee denied Plaintiff's request for a hepatic diet, noting that he was not experiencing encephalopathy.  MED 739. However, almost a year later on March 4, 2009, Defendant Dr. Williams prescribed a hepatic diet for Plaintiff because he showed signs of liver disease; Dr. Sayre approved the change.  MED 1271.

### 4. Plaintiff's Pain Treatment

Plaintiff states that, as early as August 2004, he told Nurse Risenhoover and Dr. Sayre and other PBSP medical professionals that he cannot take anti-inflammatory medications like Motrin or ibuprofen, or acetaminophen-based medications such as Tylenol, because they cause him to have liver flare-ups, internal bleeding, aggravate his esophagus and stomach and cause him severe pain, headaches and vomiting.  Masden Decl. ¶ 44.   Yet, on August 25, 2004, Nurse Risenhoover prescribed Tylenol.  Pl.'s Ex. O-1.

In May 2006, Plaintiff again told Nurse Risenhoover that the anti-inflammatory medications that she was prescribing for his pain actually caused him more pain because

1  they exacerbated his stomach pain and made him sick.  Masden Decl. ¶ 38, Pl.'s Exs. O-3,

2  O-4; Compl. ¶ 34.  On June 5, 2006, Plaintiff again advised Nurse Risenhoover that the

3  medications she was prescribing were making him sick.  Masden Decl. ¶ 44, Ex. O-4.

4       On July 19, 2006, Nurse Risenhoover prescribed acetaminophen for Plaintiff's

5  abdominal pain.  Id., Ex. O-6.  On November 1, 2006, Nurse Risenhoover again prescribed

6  ibuprofen and acetaminophen.  Id., Ex. O-7-8.  Nurse Risenhoover also prescribed

7  Ketoralac/Toradol, which Plaintiff states is contraindicated for HCV patients because it can

8  cause internal bleeding.  Id.  In addition to ibuprofen and acetaminophen, Nurse

9  Risenhoover prescribed ice for Plaintiff's pain for three days.  MED 952.  On December 4,

10  2006, Nurse Risenhoover discontinued the ibuprofen and Tylenol and prescribed Myoflex

11  cream to be applied topically.  MED 178.

12       Defendant Nurse Risenhoover prescribed the following medications for Plaintiff's

13  pain: Motrin and Tylenol, MED 25, 30, 952; Naproxen, MED 3, 5, 12, 13, 15, and 16;

14  Ketorolac Tromethamine (an anti-inflammatory drug for pain), MED 30, 952; Myoflex

15  (muscle rub for pain), MED 178, 906; and Promethazine HCL (for nausea), MED 42.   In

16  2006, Plaintiff also received physical therapy for one month to treat his lower back pain.

17  MED 1332-37; 1029-40.  Nurse Risenhoover also ordered ice compresses, MED 933, 936,

18  952, and an injection of Hydrocortisone, MED 913, 934.

19  **C.   PROCEDURAL HISTORY**

20       On November 17, 2009, Plaintiff filed a verified Complaint against Defendants.

21  Dkt. 1.  Nurse Risenhoover was Plaintiff's primary care provider from 2005 to 2009, and is

22  the primary target of Plaintiff's various allegations.  Dr. Michael Sayre is the Chief Medical

23  Officer at PBSP and is on PBSP's HCV and the UM/MAR Committees.  Nurse Donna K.

24  Alpaugh is the HCV Nurse at PBSP and allegedly was involved in denying Plaintiff's 602

25  inmate appeals for a biopsy and combination therapy.  Nurse McLean is a Registered Nurse

26  at PBSP who allegedly denied Plaintiff's request for combination therapy and his 602

27  appeals for treatment.  Dr. Williams and Dr. Wahidullah allegedly denied care to Plaintiff

28  by virtue of their positions on the HCV, UM, MAR and/or 602 review committees.

After screening the Complaint, the Court issued an Order of Service which found that Plaintiff stated a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs against the aforementioned named Defendants on the grounds that they: (1) delayed diagnosing his positive HCV status and delayed treating this condition; (2) wrongfully denied him a hepatic diet; and (3) failed properly to treat his pain. The Court also found that Plaintiff stated a cognizable claim of supervisory liability against Dr. Sayre and Nurse McLean. The Court dismissed Plaintiff's claims against the unnamed Defendants. All Defendants were served except for Dr. Wahidullah, who could not be found at that time.

On February 10, 2012, all Defendants, except for Dr. Wahidullah, filed a motion for summary judgment. Dkt. 73.[6] Plaintiff did not file a timely opposition to the summary judgment motion. Instead, he filed a motion for continuance under Federal Rule of Civil Procedure 56(d). Dkt. 90. On June 28, 2012, the Court denied Plaintiff's motion and directed him to file his opposition by July 25, 2012. Dkt. 98. The Court later extended the deadlines for Plaintiff's opposition to August 24, 2012, and Defendants' reply to September 7, 2012. Dkt. 108.

On September 10, 2012, Defendants filed a "Statement Regarding Reply," claiming that they did not file a reply because Plaintiff had failed to file an opposition. Dkt. 116. However, on October 3, 2012, Plaintiff filed an opposition to Defendants' motion for summary judgment along with a declaration and voluminous supporting exhibits. Dkt. 118-19. On October 9, 2012, Plaintiff filed a motion to compel discovery. Dkt. 120. Defendants did not file a reply, but on October 15, 2012, they filed a motion to strike Plaintiff's opposition and supporting documents. Dkt. 121.

---

[6] On February 27, 2012, Dr. Wahidullah was served. Dkt. 86.  On April 6, 2012, Dr. Wahidulla answered the complaint, Dkt. 92, but he has not filed a motion for summary judgment or other dispositive motion.

**D.   PRELIMINARY ISSUES**

Before addressing the merits of Defendants' motion for summary judgment, the Court first resolves several preliminary matters relating to the motion.

**1.   Defendants' Motion to Strike or to Extend Time to Respond**

Defendants move to strike Plaintiff's opposition and declaration on the grounds that they are untimely and were not properly served on them, and that the opposition brief exceeds twenty-five pages, in violation of Civil Local Rule 7-3(a).  In addition, Defendants object to Plaintiff's exhibits that refer to the medical conditions and treatment of other inmates, an on-line petition for federal receivership of PBSP, a declaration from Dr. Everett D. Allen pertaining to matters unrelated to the issues presented in this case, and documents related to time periods that are not relevant to this case.  Dkt. 119-6 at 49, 64-65; Dkt. 119-6 at 41-43; Dkt. 119-5 at 141-150, Dkt. 119-6 at 1-35; Dkt. 119-1 at 29-31, 119-2 at 7, 119-3 at 4-6, 12; Dkt. 119-5 at 61-94.

With regard to Plaintiff's opposition papers, Defendants are correct that Plaintiff's filings are untimely and are not in compliance with the Local Rules.  However, Defendants, in fact, received copies of Plaintiff's submissions through ECF.  And despite the length of Plaintiff's papers, the Court has thoroughly reviewed them, along with Defendants' substantial filings.  As a result, the Court is in a position to render an informed decision on the summary judgment motion, irrespective of whether Defendants have filed a reply.[7]  As for Defendants' objections to certain of Plaintiff's exhibits, the Court finds that the exhibits at issue lack relevance under Federal Rule of Evidence 402 and/or are not properly

---

[7] Defendants rightfully complain that Plaintiffs' opposition and declaration raise a number of issues beyond the pleadings and request that the Court not consider any unpled claims.  On a motion for summary judgment, the plaintiff's allegations and theories of liability are confined to those found in the operative complaint.  Pickern v. Pier 1 Imps. (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to assert new specific factual allegations in support of a claim when they were "presented for the first time in [the plaintiff's] opposition to summary judgment"); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").  As such, the Court confines its analysis and consideration of evidence only to those claims pled in the Complaint.

authenticated under Rule 902.  Accordingly, the Court strikes the exhibits identified above.  See *supra* at 12:11-12.

In sum, the Court DENIES Defendants' motion to strike Plaintiff's opposition and declaration, and their alternative request for additional time to file a reply.  The Court GRANTS Defendants' motion to strike the exhibits identified above and will disregard any facts or argument that are not germane to the claims alleged in the Complaint and/or which lack foundation in Plaintiff's opposition and supporting declaration that are not germane to the claims alleged in the Complaint and/or which lack foundation.

### 2.    Plaintiff's Objections to Dr. Sayre's Declaration

In paragraph 32 of his declaration, Defendant Dr. Sayre states that:  "At all times, Madsen's care was within the CDCR's standard of care and was consistent with the degree of knowledge and skill ordinarily possessed and exercised by members of my profession under similar circumstances."  In his opposition, Plaintiff objects to this opinion on the ground that Dr. Sayre is not qualified to provide such opinion testimony.  However, because the Court does not consider this particular opinion to be pertinent to its analysis, Plaintiff's objection is OVERRULED as moot.

Separately, Plaintiff argues that a number of statements in Dr. Sayre's declaration regarding Plaintiff's medical care are not based upon his personal knowledge because Plaintiff never had a medical appointment with Dr. Sayre.  Yet, in both his opposition and declaration, Plaintiff alleges that medical decisions affecting his treatment were made by Nurse Risenhoover and Dr. Sayre.  Furthermore, Dr. Sayre has shown that as Chief Medical Officer at PBSP and Nurse Risenhoover's supervisor, he has personal knowledge of Plaintiff's medical treatment, the CDCR diagnostic and treatment protocol for inmates with HCV, and the symptoms associated with HCV.  Therefore, Plaintiff's objection is OVERRULED.

### 3.    Plaintiff's Motion Regarding Access to the Court

Plaintiff contends that prison officials and law library staff are "agents of Defendants" who are interfering with his access to the Court by refusing to copy and mail

his legal mail, consisting of:  (1) Plaintiff's medical file that he desired to mail to two medical experts for their review; and (2) interrogatories to witnesses.   However, Plaintiff provides no competent, admissible evidence that these unnamed individuals are Defendants' agents or that they, in fact, interfered with his mail.  This motion is DENIED.

### 4.    Plaintiff's Motion to Compel Discovery

Plaintiff filed a motion to compel on October 9, 2012, several days after he filed his opposition to Defendants' motion for summary judgment.  In his motion, Plaintiff requests an order compelling Defendants and other third parties to answer his interrogatories. Moving Defendants oppose on the grounds that: (1) they cannot respond for individuals who are not parties to the action and who their counsel does not represent; (2) Plaintiff failed to serve the motion to compel on counsel for Defendants in violation of Federal Rule of Civil Procedure 5(a); (3) Plaintiff failed to meet and confer with counsel for Defendants before filing his motion to compel as required by Civil Local Rule 37-1(a); and (4) Plaintiff's motion to compel is vague and incomprehensible in violation of Civil Local Rule 37-2.  Defendant Dr. Wahidullah separately opposes the motion on the grounds that: (1) he has timely served responses and objections to Plaintiff's sets of interrogatories; (2) Plaintiff has failed to meet and confer with counsel before filing his motion to compel, in violation of Civil Local Rule 37-2(a); and (3) Plaintiff has failed to state what particular requests to Dr. Wahidullah are at issue, in violation of Civil Local Rule 37-2.  All of Defendants' arguments are well taken, and Plaintiff's reply to Defendants' oppositions is entirely non-responsive.  Therefore, Plaintiff's motion to compel discovery is DENIED without prejudice.

### 5.    Defendants' Request for Judicial Notice

Defendants request the Court take judicial notice of  the following documents: (1) Order Adopting Special Master's Report Regarding March 2004 Revised Hepatitis C Clinical Management Program filed in <u>Madrid v. Cate</u>, ECF No. 1744, June 3, 2004; (2) Special Master's Report Regarding March 2004 Revised Hepatitis C Clinical Management Program filed in <u>Madrid v. Cate</u>, ECF No. 1744, April 23, 2004; and

1   (3) Order Re Receiver's May 2007 Preliminary Plan of Action and Plaintiff's Motion for

2   Order Directing Receiver to Comply with April 4, 2003 Order filed in <u>Plata v. Brown</u>, Case

3   No. C 01-1351 THE, ECF No. 826, September 6, 2007.  Plaintiff has not opposed the

4   request for judicial notice.

5          A court properly may take judicial notice of matters of public record, particularly if

6   those proceedings have a direct relation to the matters at issue.  <u>Lee v. City of Los Angeles</u>,

7   250 F.3d 668, 689 (9th Cir. 2001); <u>Bias v. Moynihan</u>, 508 F.3d 1212, 1225 (9th Cir. 2007);

8   <u>see also</u> <u>MGIC Indem. Corp. v. Weisman</u>, 803 F.2d 500, 504 (9th Cir. 1986).  The Court

9   therefore GRANTS Defendants' request for judicial notice of the documents referenced

10  above.

11  **II.     LEGAL STANDARD**

12         **A.     SUMMARY JUDGMENT**

13         Federal Rule of Civil Procedure 56 provides that a party may move for summary

14  judgment on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P.

15  56(a)(1).  "The court shall grant summary judgment if the movant shows that there is no

16  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

17  law." <u>Id.</u>; <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The movant

18  bears the initial burden of demonstrating the basis for the motion and identifying the

19  portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions

20  on file that establish the absence of a triable issue of material fact.  <u>Celotex Corp. v. Catrett</u>,

21  477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts

22  of materials in the record").  If the moving party meets this initial burden, the burden then

23  shifts to the non-moving party to present specific facts showing that there is a genuine issue

24  for trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

25  475 U.S. 574, 586-87 (1986).

26         "On a motion for summary judgment, 'facts must be viewed in the light most

27  favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"

28  <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting in part <u>Scott v. Harris</u>, 550 U.S. 372,

380 (2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. A factual dispute is genuine if it "properly can be resolved in favor of either party." Id. at 250. Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). Only admissible evidence may be considered in ruling on a motion for summary judgment. Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

### B.    42 U.S.C. § 1983

Section 1983 "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. Graham v. Connor, 490 U.S. 386, 393-94 (1989). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

Liability may be imposed on an individual defendant under 42 U.S.C. § 1983 only if the plaintiff can show that the defendant proximately caused the deprivation of a federally protected right. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988); Harris v. City of Roseburg, 664 F.2d 1121, 1125 (9th Cir. 1981). A person deprives another of a constitutional right within the meaning of § 1983 if he does an affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to do, that causes the deprivation of which the plaintiff complains. Leer, 844 F.2d at 633. To defeat summary judgment, sweeping conclusory allegations will not suffice; the plaintiff

1  must instead "set forth specific facts as to each individual defendant's" actions which

2  violated his or her rights.  Id. at 634.

3      Deliberate indifference to serious medical needs violates the Eighth Amendment's

4  prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104

5  (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other

6  grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

7  "Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051, 1060

8  (9th Cir. 2004).  In order to be liable for deliberate indifference, an official must know of

9  and disregard an excessive risk to inmate health or safety.  Farmer v. Brennan, 511 U.S.

10 825, 832 (1991).  Two requirements must be met:  (1) the deprivation must be, objectively,

11 sufficiently serious; and (2) the prison official must be, subjectively, deliberately indifferent

12 to inmate health or safety.  Id. at 834. As to the subjective factor, the official must both be

13 aware of facts from which the inference could be drawn that a substantial risk of serious

14 harm exists, and must also draw the inference.  Id.  In addition, harm must have resulted

15 from the indifference.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

16     To prevail on a claim involving choices between different treatment modalities, a

17 plaintiff must show that the chosen treatment "was medically unacceptable under the

18 circumstances," and was chosen "in conscious disregard of an excessive risk to [the

19 prisoner's] health."  Toguchi, 391 F.3d at 1058 (citing Jackson v. McIntosh, 90 F.3d 330,

20 332 (9th Cir. 1996)).  Deliberate indifference is a state of mind "more blameworthy than

21 negligence."  Farmer, 511 U.S. at 835.  Even gross negligence is insufficient to establish

22 deliberate indifference to serious medical needs.  Wood, 900 F.2d at 1334.  Only a prison

23 official who knows both of "facts from which the inference could be drawn" that an

24 excessive risk of harm exists and who actually draws that inference is deliberately

25 indifferent to the inmate's health.  Farmer, 511 U.S. at 837.  A difference of opinion

26 between a prisoner-patient and prison medical authorities regarding treatment does not give

27 rise to a §1983 claim.  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

28

## III.   DISCUSSION

Plaintiff's claims of deliberate indifference fall into general categories relating to: (1) delayed diagnosis and treatment of HCV; (2) denial of a hepatic diet; (3) failure to treat his complaints of pain; and (4) the handling of his 602 inmate appeals.  Defendants acknowledge that Plaintiff's health problems resulting from his HCV condition constitute a serious medical need.  However, they contend that they were not deliberately indifferent in responding to his medical and health issues.  The Court discusses these issues seriatim.

### A.   DELAYED DIAGNOSIS AND TREATMENT

Plaintiff contends that Defendants were deliberately indifferent in diagnosing his HCV which, in turn, caused harm by delaying his treatment.  Plaintiff presents a number of separate allegations of delay, which are discussed below.

#### 1.   Failure to Complete Lab Test

As an initial matter, Plaintiff alleges that when he first arrived at PBSP in March 2002, Dr. Wolff ordered a hepatitis panel for him but that it was "never performed." Compl. ¶ 22.  Defendants argue that Dr. Wolff ordered a lab test for Plaintiff, but that on March 28, 2002, he refused the test.  MED 2166.  In his declaration, Plaintiff states that "he did not refuse his labs."  Pl.'s Decl. ¶ 5.  This factual dispute, however, is inapposite.  The fact that his blood test was not completed in 2002 is insufficient to establish that any Defendant was deliberately indifferent to Plaintiff's serious medical need.  First, the only individual that Plaintiff implicates in the "failure" to complete his hepatitis blood panel is Dr. Wolff, who has not been named as a Defendant in this case.  Second, in 2002, neither Dr. Wolff nor any Defendant knew that Plaintiff had HCV because it had not been diagnosed—and because Plaintiff himself had indicated on his medical questionnaire forms that he had no history of hepatitis or symptoms of liver disease.  MED 2155, 2157. Therefore, Plaintiff has not demonstrated that any failure to complete the test could have been related to Plaintiff's serious medical need because, at that time, Defendants were unaware that Plaintiff had such a need.

1

## 2.      Delayed Notification of Test Results

2
Plaintiff next contends that Defendants were deliberately indifferent by delaying in

3
notifying him that he had tested positive for HCV.  He claims that on May 2, 2003, blood

4
samples were taken "per Defendant Risenhoover," but that she did not notify him that he

5
had tested positive for HCV until May 2004.  Compl. ¶ 23.  As support, Plaintiff points to

6
Notification to Patient of Laboratory Test Results, in which "5-2-03" is handwritten as test

7
date in the upper part of the form.  MED 1245.  The "5-02-03" entry, however, is a

8
typographical error.  The form itself was signed by Nurse Risenhoover on May 8, 2006.  Id.

9
This is consistent with the actual test results from Quest Diagnostics ("Quest"), the outside

10
laboratory which performed the tests, which shows that the blood sample was collected on

11
May 2, received on May 3, and reported on May 4, 2006.  MED 1243.  The Quest form was

12
signed and dated on May 8, 2006, the same date that Nurse Risenhoover completed the

13
patient notification form.  MED 1245.  Moreover, since Nurse Risenhoover was Plaintiff's

14
primary care provider from 2005 through 2009, it is entirely illogical that she would have

15
ordered a blood test for Plaintiff in 2003 when she was not yet his primary care provider.

16
See Risenhoover Decl. ¶ 5.

17
In an attempt to raise a material issue of fact as to when his test was performed,

18
Plaintiff contends that his medical records for the relevant time period are missing, and

19
cites a finding in the Madrid case that the medical records system at PBSP had serious

20
problems before 2005.  Opp'n at 3.  This contention lacks merit.  Where, as here, the

21
movant's evidence is sufficient to support summary judgment, the non-moving party cannot

22
rely on the purported lack of evidence to show that a genuine dispute of material fact exists.

23
See Celotex, 477 U.S. at 323; Bhan, 929 F.2d at 1409.  Viewing the evidence in the light

24
most favorable to Plaintiff, the Court finds that there is no triable issue of fact regarding

25
Plaintiff's claim that Nurse Risenhoover delayed a year in notifying Plaintiff of his test

26
results.

27

28

### 3.    Delayed Testing for HCV

Plaintiff next contends that Defendants acted with deliberate indifference by delaying their testing for HCV in a manner inconsistent with the Guidelines.  More specifically, Plaintiff claims that:  (1) he was not notified of the June 27, 2005 positive HCV antibodies test results until November 2005; (2) Nurse Risenhoover waited for five months after the June 2005 test results to order a quantitative test for his HCV viral load; (3) Nurse Risenhoover incorrectly indicated on Plaintiff's patient notification form that his December 13, 2005 test result was "normal" when it was not; and (4) Plaintiff did not receive an ALT test one month after the initial testing as required by Phase I of the Guidelines.  The Court discusses these issues, in turn.

With regard to Plaintiff's first claim, the parties dispute whether and when Plaintiff received notice of the June 27, 2005 test results.  The Guidelines require notice of all test results, and a face-to-face meeting when the inmate tests positive for HCV.  MED 2387.  Defendants assert that Plaintiff was properly notified of his test results, but neglect to provide any specific evidence as to *when* or *how* Plaintiff was provided with such notice.  Rather, they rely on Nurse Risenhoover's progress note from Plaintiff's November 29, 2005 visit, in which she reported him as stating:  "I also got a notice on some lab work back *in June* and I would like to talk about it.  I was suppose [sic] to be called in."  MED 1046 (emphasis added).  Defendants claim this constitutes an admission by Plaintiff that he was notified of his positive test result in June 2005.  Defs.' Mot. at 12.  However, not only is the statement ambiguous as to what Plaintiff was referring, the progress note constitutes double hearsay.  Since a motion for summary judgment must be supported by admissible evidence, see Orr, 285 F.3d at 773, the Court finds that Defendants have failed to carry their initial burden under Rule 56 of establishing that they did not delay in notifying Plaintiff of his positive test result for HCV.

Second, the Court likewise finds that Defendants have failed to carry their burden of demonstrating that there is no genuine issue of material fact regarding their delay in ordering a quantitative test to confirm Plaintiff's positive HCV antibody test result.  The

Guidelines do not establish a specific time-frame between these two tests; nonetheless, Phase I (Screening and Initial Diagnosis) instructs that "[t]he anticipated time period for an inmate-patient to complete Phase I is three (3) months."  MED 2386 (Guideline No. 7).  "Phase I terminates and Phase II begins on the date that the inmate-patient is informed of his or her positive test result."  Id.  Here, Nurse Risenhoover notified Plaintiff of his positive antibody test result on July 6, 2005, but did not order a quantitative test for HCV viral load until over five months later on December 8, 2005.  MED 1248-1250.  In addition, Nurse Risenhoover did not have a face-to-face meeting with plaintiff regarding his positive HCV diagnosis until January 9, 2006.  MED 1044, 1247.  Thus, Phase I took over six months to complete, which is over twice as long as the three-month period prescribed by the Guidelines.  Tellingly, Defendants offer no explanation for this gap.

Plaintiff's third claim of delayed testing is less compelling.  In particular, Plaintiff attempts to make much of the fact that Nurse Risenhoover checked the box for "Your test results are normal" on the Notification to Patient of Laboratory Test Results form, dated December 13, 2005.  MED 1250.  Plaintiff claims that the "normal" designation demonstrates that Nurse Risenhoover ignored the medical data that would have compelled her to undertake further tests.  Compl. ¶ 27.  The Court disagrees.  Plaintiff overlooks that, on the bottom of the same form, Nurse Risenhoover typed that his ALT and other levels were at "abnormal elevation."  MED 1250.  This error may be sufficient to show negligence, but it does not constitute deliberate indifference.

Finally, Plaintiff is correct in noting that he was not timely provide with a second ALT test within one month of his initial positive result based on the December 8, 2005 test.  The Guidelines provide that "[a] repeat ALT level shall be obtained one month after initial testing if the patient is 45 years old or younger and the initial ALT level was less than two (2) times the normal laboratory value."  MED 2386.  Although Plaintiff met both criteria, the next ALT test was not performed until five months later on May 2, 2006—well past the one-month deadline.  Defendants counter that Nurse Risenhoover ordered another ALT test which was performed on June 10, 2006 which was approximately a month after the May 2,

2006 test.  Defs.' Mot. at 14.  However, Defendants ignore that Plaintiff's December 8, 2005 test confirmed that he was positive for HCV.  Id. at 5.  Defendants offer no explanation why a second test for ALT level was not performed within one month of the December 8, 2005 test.

In sum, the Court finds that there are issues of fact regarding whether Defendants delayed in testing Plaintiff for HCV.  That finding, standing alone, however, does not necessarily preclude summary judgment.  As noted, the delay is only one component of Plaintiff's deliberate indifference claim.  According to Plaintiff, the harm from delayed testing is the concomitant delay in providing treatment.  As will be discussed in more detail in Section III.B, *infra*, any delay in testing was harmless.

The specific treatment for HCV sought by Plaintiff was a liver biopsy and combination therapy, which he alleges were warranted based on his symptoms and test results.  However, the evidence shows that Defendants followed the Guidelines for treating HCV patients that were developed and approved by this Court in the Madrid case.  The Guidelines indicated a biopsy and combination therapy for patients who were 45 years-old or younger only if the inmate's ALT levels test results were twice the normal rate for three consecutive months.  Even if Plaintiff were notified sooner of his test results, the fact remains that his ALT test results, while elevated, were less than twice normal.  Thus, under the Guidelines, he did not qualify for a biopsy or combination therapy.  Although Plaintiff's ALT test results later met the requisite levels in November 2007, the Guidelines contraindicated such treatment as being too dangerous given Plaintiff's other conditions.  Accordingly, the Court finds that, as a matter of law, and as discussed in more detail below, Defendants' purported delay in notifying Plaintiff of his test results does not amount to deliberate indifference.

## B.   TREATMENT FOR HCV

### 1.   Adherence to the Guidelines

Plaintiff contends that Defendants ignored medical data that indicated the need for a liver biopsy and anti-viral treatment.  After his initial diagnosis, Nurse Risenhoover, in

1   consultation with Dr. Sayre, denied Plaintiff's requests for a liver biopsy and anti-viral

2   medication on the grounds that his ALT levels were not double of normal, as required for

3   treatment under the Guidelines.  Plaintiff argues that Nurse Risenhoover and Dr. Sayre's

4   decision to adhere to the Guidelines in his particular case was medically improper because

5   the ALT levels required in the Guidelines for a person under the age of 46 to qualify for

6   HCV treatment is too high.  Pl.'s Opp'n at 24-27.

7          To support his contention that Nurse Risenhoover and Dr. Sayre should have

8   deviated from the Guidelines, Plaintiff relies on a copy of a declaration from Dr. D.W.

9   Winslow, then the Health Care Manager at PBSP, which ostensibly was filed in Wilson v.

10  Winslow, et al., Case No. C 00-1255 PJH.  Pl.'s Decl., Ex. G, Dkt. 119-1.  Pl.'s Opp'n at

11  25.  In his declaration, which is dated March 21, 2001, Dr. Winslow opined that "ALT

12  levels alone do not correlate well as to the actual condition of the liver."  Pl.'s Decl., Ex. G

13  ¶ 7.  In addition, Plaintiff alleges that Quest, the company that performed Plaintiff's ALT

14  tests, colluded with PSPB to keep the ALT reference range artificially high for budgetary

15  reasons so that PBSP would be able to treat fewer HCV positive inmates.  Plaintiff's

16  argument are unavailing.

17         As a threshold matter, Dr. Winslow's statements in 2001 are of marginal probative

18  value to the medical practices in 2005 through 2009, the years at issue here.  That aside, Dr.

19  Winslow's statement did not address the ALT levels referenced in the Guidelines, which at

20  that time had yet to be developed.  As noted, the Guidelines were developed and approved

21  in 2004 in connection with the Madrid case, based on numerous meetings with health care

22  professionals, counsel and experts.   RJN, Ex. A (Madrid v. Cate, et al., No. C 90-3094

23  TEH, 2004 Special Master's Report, adopted by the Court).  Given the procedural history

24  underlying the adoption of the Guidelines, the Court finds that Dr. Winslow's remarks in an

25  unrelated action are insufficient to raise a genuine issue of material fact regarding whether

26  the ALT levels in the Guidelines are unreasonable.  Furthermore, Plaintiff's assertion that

27  the ALT levels were intentionally set at a high level as a cost saving measure is completely

28  unsupported.

### 2.      Treatment with Combination Therapy

Plaintiff argues that he should have been allowed to undergo a liver biopsy and/or combination therapy after his ALT levels became sufficiently high under the Guidelines to indicate such treatment; i.e., twice their normal level.  However, the record shows that by the point that Plaintiff qualified for a liver biopsy and combination therapy (based on his age and ALT levels), such treatment was excluded under the Exclusion Criteria for Combination Therapy, which provides that no biopsy or treatment should be given to patients with decompensated cirrhosis.  MED 2394; Sayre Decl. ¶¶ 27-28.  Plaintiff counters that notwithstanding the Exclusion Criteria, he should have been allowed to undergo combination therapy, even if a biopsy were contraindicated.  Pl.'s Opp'n at 27.  No evidence is offered to support Plaintiff' assertion.  The record demonstrates that Defendants' decision not to provide combination therapy, notwithstanding Plaintiff's ALT levels, was entirely consistent with the Guidelines—and more specifically, its Exclusion Criteria.  There is no evidence showing that such decision was medically unacceptable.

Plaintiff argues that Nurse Risenhoover knew his condition was worsening and that there was a risk of substantial harm if his HCV was untreated, and that she failed to take reasonable steps to abate the problem.  Even if true, the Exclusionary Criteria prevented her from prescribing combination therapy.  In addition, Nurse Risenhoover did not ignore Plaintiff's requests for combination therapy, as shown by the fact that she presented his requests to the UM Committee, which denied them.  MED 1293 (August 7, 2007); MED 1289 (March 17, 2009)).  Plaintiff suggests that it was unnecessary for Nurse Risenhoover to resort to the UM Committee for approval and that she should have ordered treatment on her own volition or sought relief from the CDCR Director of Health Services.  However, the Guidelines envisioned that disputes over a course of treatment, such as those posited by Plaintiff, would be handled by the UM Committee.  Nurse Risenhoover cannot be found to be deliberately indifferent by following the protocols established in the <u>Madrid</u> case which were aimed at ensuring constitutionally adequate medical care.

Next, Plaintiff cites <u>Sealock v. Colorado</u>, 218 F.3d 1205, 1211 (10th Cir. 2000) for the proposition that a prison official acting as a "gatekeeper" who denies an inmate access to medical care "may be liable for deliberate indifference from denying access to medical care." That proposition has no application here. There is no evidence that Nurse Risenhoover acted as a "gatekeeper." Rather, she served as Plaintiff's primary care provider, who, by all accounts, provided treatment and medication, consulted with other medical staff and the UM Committee and otherwise comported with the Guidelines. Although the medical treatment provided to Plaintiff may not have been what he desired, he presents no evidence that Defendants failed to treat him after he was diagnosed with HCV. <u>See</u> <u>Toguchi</u>, 391 F.3d at 1059-60 (holding that defendant's utilization of an ineffective course of treatment may amount to negligence but not deliberate indifference). Rather, the record indicates that Defendants: (1) diagnosed Plaintiff with HCV in 2005; (2) monitored his ALT levels to determine the proper course of treatment; and (3) carefully considered his requests for treatment in light of the relevant protocol in the Guidelines. Therefore, the Court finds that Plaintiff has failed to raise a triable issue of fact as to whether Defendants acted with deliberate indifference in diagnosing and treating his HCV. <u>See</u> <u>Farmer</u>, 511 U.S. at 834.

## C. HEPATIC DIET

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by failing to provide him with a hepatic diet. Pl.'s Decl. ¶ 49. The denial of a medically-necessary diet may support a finding of deliberate indifference to serious medical needs. <u>See</u> <u>Sellers v. Henman</u>, 41 F.3d 1100, 1102 (7th Cir. 1994) (inmate taken off his diabetic diet could state a claim for deliberate indifference if he could show that defendants knew he needed such a diet and deliberately withheld it); <u>Byrd v. Wilson</u>, 701 F.2d 592, 595 (6th Cir. 1983) (reversing district court's dismissal of deliberate indifference claim where inmate requiring special medical diet was denied medication and special diet for two days).

1    Defendants argue that despite Plaintiff's claims to the contrary, he has, in fact, been

2   provided with a hepatic diet except in 2006, when the Guidelines specified that only those

3   patients with HCV who could not get sufficient nutrition from the prison heart healthy diet

4   were entitled to a hepatic diet.  Defs.' Mot. at 18.  Aside from that, Defendants provided

5   Plaintiff with a hepatic diet for 180 day beginning on August 6, 2007 and again on

6   February 8, 2008 for an additional 180 days.  MED 785.  However, in 2008, the Guidelines

7   changed such that hepatic diets were then limited to patients suffering from

8   encephalopathy.  MED 746, 2490.  Based on that policy change and their determination

9   that Plaintiff was not suffering from encephalopathy, Defendants took Plaintiff off his a

10   hepatic diet on May 15, 2008.  MED 150.  It was not until March 4, 2009 that Plaintiff's

11   hepatic diet was restored when Dr. Williams ordered the hepatic diet on the ground that

12   Plaintiff had end stage liver disease.  MED 1271.

13    Plaintiff focuses on the time period beginning in May 2008 when he was taken off a

14   hepatic diet.  Pl.'s Decl. ¶ 49.  According to Plaintiff, after he was taken off a hepatic diet,

15   his ammonia levels rose dangerously, causing severe episodes of encephalopathy and

16   increased episodes of liver flare-ups, severe abdominal pains and bleeding.  Id.  Plaintiff

17   claims that these symptoms showed that he had encephalopathy, thus qualifying him for a

18   hepatic diet under the Guidelines.  He further alleges that on June 8, 2008, Drs. Sayre and

19   Williams and Nurse Risenhoover refused to see him for "serious medical problems" he was

20   experiencing as a result of his dietary change.  Compl. ¶ 60.

21    Plaintiff also points to an October 8, 2008 progress note from Dr. Martinelli, an

22   HCV specialist, which states that Plaintiff had encephalopathy which was being treated

23   with lactulose, and that Plaintiff "will be continued on his present meds and Hep C diet."

24   Pl.'s Ex. R-33.  Plaintiff argues that since Dr. Martinelli diagnosed him with

25   encephalopathy, Nurse Risenhoover and Dr. Sayre's failure to follow his order for a hepatic

26   diet shows that they were deliberately indifferent to his serious medical needs.  Defendants

27   counter that Plaintiff's complaints "were not credible" and that if he in fact had

28   encephalopathy, it would have been "clear" to them.  At best, they argue, Plaintiff has

1  shown a disagreement over the course of treatment, which is insufficient for purposes of

2  establishing liability under § 1983.

3      The Court finds that Plaintiff has raised a genuine issue of material fact on his claim

4  regarding the failure to provide a hepatic diet.  Defendants assert that Plaintiff could not

5  have had encephalopathy because Plaintiff was taking lactulose (a laxative), which was

6  intended to remove toxins from the body.  Defs.' Mot. at 18.  But Defendants ignore that

7  Plaintiff was taken off lactulose on November 3, 2008, Compl. ¶ 73, and fail to account for

8  Dr. Martinelli's diagnosis of encephalopathy and his prescription for a hepatic diet.  See

9  Jett, 439 F.3d at 1097-98 (finding a triable issue of fact as to whether a prison doctor was

10  deliberately indifferent to a prisoner's medical needs when he decided not to request an

11  orthopedic consultation as the prisoner's emergency room doctor had previously ordered).

12  Nor do they explain why, in March 2009, when Dr. Williams prescribed a hepatic diet for

13  Plaintiff, Dr. Sayre approved it and Plaintiff was put on the diet.  Although Dr. Williams

14  gave the reason as "end stage liver disease," Plaintiff had this diagnosis well before March

15  2009.  MED 1293 (noting that Plaintiff was diagnosed with end stage liver disease in

16  August 2007).

17      In sum, the Court finds that summary judgment is not warranted as to Nurse

18  Risenhoover, Dr. Sayre and Dr. Williams, since Plaintiff has raised a triable issue of

19  material fact on whether they were deliberately indifferent to his dietary requirements.

20      **D.**   **PAIN TREATMENT**

21      Plaintiff next alleges that Defendants were deliberately indifferent with respect to his

22  pain treatment.  The failure to address a prisoner's complaints of pain through the provision

23  of appropriate medication may give rise to an Eighth Amendment violation for deliberate

24  indifference.  See Chess v. Dovey, No. CIV S-07-1767 LKK DAD P, 2011 WL 567375, at

25  *20-21 (E.D. Cal. Feb. 15, 2011) (denying summary judgment where inmate was given

26  Tylenol and aspirin instead of methadone, even though the plaintiff had informed

27  defendants that such medications were insufficient to address his withdrawal symptoms and

28  pain); Lavender v. Lampert, 242 F. Supp. 2d 821, 843 (D. Or. 2002) (denying summary

judgment where defendants engaged in an ongoing pattern of ignoring and failing to manage inmate's chronic pain).

Since 2004, Plaintiff had advised PBSP medical staff that he could not use nonsteroidal anti-inflammatory drugs, such as ibuprofen, aspirin, or acetaminophens, because they make him sick, cause him to suffer from "liver flare-ups," internal bleeding and severe pain. Masden Decl. ¶¶ 38, 44. Despite this awareness, Plaintiff avers that Nurse Risenhoover and Dr. Sayre continued to prescribe these medications. Pl.'s Exs. O-2 (ibuprofen on Oct. 19, 2005); O-6 (acetaminophen on July 19, 2006); O-7 (ibuprofen and acetaminophen on November 1, 2006)). Plaintiff informed Nurse Risenhoover and other medical staff, on multiple occasions that he would not take the pain medications because they made him feel worse. Pl.'s Exs. O-10 (April 7, 2006); O-9 (Jan. 1, 2007)).

Defendants do not dispute that Plaintiff complained about the pain and discomfort resulting from the aforementioned medications; however, they contend that such drugs were "medically acceptable" and "permitted" by the Guidelines. Defs.' Mot. at 19 (citing MED 2345, 2371). This argument is misplaced. The document cited by Defendants is a handout intended *for inmates* which is entitled, <u>General Instructions for Hepatitis C Patients</u>. MED 2345. The handout specifically warns that "Aspirin and Ibuprofen (Motrin, Advil) should be used with *extreme caution* and only *after discussion with your physician*." MED 2345 (emphasis added). It further states that, "You may use acetaminophen (Tylenol) for pain ... but the dose should not exceed 4 grams per day and chronic use should be avoided." <u>Id.</u> Thus, it is clear that these medications for HCV patients are not to be dispensed indiscriminately, without regard to the patient's feedback, as Defendants seem to suggest.

Equally uncompelling is Defendants' ancillary assertion that they provided other pain treatments, including physical therapy for one month, cream, ice packs and a hydrocortisone shot. Defs.' Mot. at 19. However, the handout contraindicates the use of "injection drugs," MED 2345, and according to Plaintiff, the hydrocortisone shot made him ill. Masden Decl. ¶ 44. As for the other treatments, Plaintiff claims they did not address his

pain issues.  While Defendants attempt to dismiss this situation as merely a difference of opinion, there is evidence that Nurse Risenhoover continued to follow an ineffective course of pain treatment for Plaintiff despite his repeated complaints that her actions were exacerbating his condition and causing severe side effects.  Thus, viewing the evidence in a light most favorable to Plaintiff, Nurse Risenhoover's treatment could be construed being deliberately indifferent.  See McElligott v. Foley, 182 F.3d 1248, 1257-58 (11th Cir. 1999) (jury could infer treating plaintiff's pain with Tylenol was so cursory, it amounted to no treatment at all).  In short, the Court finds that there are genuine issues of material fact that preclude resolving Plaintiff's pain claim on summary judgment.

### E.    REMAINING CLAIMS AND PARTIES

#### 1.    Nurses McLean and Alpaugh

Plaintiff's deliberate indifference claim against Nurses McLean and Alpaugh is based upon their denial of his 602 appeals and/or upon the fact that they were members of the MAR or other PBSP committees that denied his requests for a biopsy and anti-viral treatment.  See, e.g., Compl. ¶¶ 41, 44, 48.  As discussed above, the Court has found that the diagnosis and treatment of Plaintiff's HCV by his primary care providers were not constitutionally deficient. As such, the denial of Plaintiff's appeals of his HCV treatment cannot state a claim for deliberate indifference.  Accordingly, Plaintiff has failed to raise a triable issue as to whether defendants Nurses McLean and Alpaugh purposefully ignored or failed to respond to his medical needs by denying his inmate appeals or requests for medical review.[8]

#### 2.    Supervisory Liability of Dr. Sayre and Nurse McLean

In his complaint, Plaintiff alleges that Dr. Sayre and Nurse McLean are liable by virtue of their role as supervisors.  Compl. ¶¶ 82-83.  There is no respondeat superior

---

[8] In his declaration, Plaintiff claims that Nurse Alpaugh informed him that the MAR Committee denied his request for an extra lunch.  Masden Decl. ¶ 42.  This claim was not alleged in the Complaint and is thus not properly before the Court.  See Pickern, 457 F.3d at 968-69.  That aside, Plaintiff has presented no evidence that Nurse Alpaugh personally knew of Plaintiff's special dietary requirements but specifically refused to accommodate those requirements.

liability under § 1983 based on the actions or omissions of a subordinate.  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  A supervisor generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  <u>Id.</u>  A supervisor may also be held liable if he or she implemented "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc) (citation omitted).

The evidence shows that Nurse Risenhoover consulted frequently with Dr. Sayre such that there is a question of fact whether he was directly involved in the failure to provide Plaintiff with a hepatic diet and the failure to properly treat his pain.

As to Nurse McLean, Plaintiff alleges that she became aware of his improper medical treatment through his administrative appeals and that she "cannot insulate herself from responsibility for allowing the continuation of the alleged unlawful conduct within her supervisory responsibility to continue."  Comp. ¶ 82.  In light of the Court's determination that Plaintiff's medical treatment regarding his HCV was not constitutionally deficient, it follows then that Nurse McLean cannot be found liable for allegedly deficient treatment. Also, as discussed above, Plaintiff has failed to raise a triable issue of fact regarding Nurse McLean's involvement with his treatment from her denial of 602 appeals or as a member of a medical committee that denied his requests for treatment. [9]

**F.    QUALIFIED IMMUNITY**

As an alternative matter, Defendants contend that they are entitled to summary judgment on the grounds of qualified immunity.  Defs.' Mot. at 20.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally

---

[9] In the declaration accompanying his opposition to Defendants' summary judgment motion, Plaintiff alleges that he told Nurse McLean on numerous occasions about his continuing, debilitating pain, and that she did nothing to remedy the treatment he was receiving from Nurse Risenhoover.  Madsen Dec. ¶ 46.  Since this claim was not alleged in the Complaint, it is not properly before the Court.  <u>See</u> <u>Pickern</u>, 457 F.3d at 968-69.

1  deficient, reasonably misapprehends the law governing the circumstances she confronted."

2  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  The issue of qualified immunity generally

3  entails a two-step process, which requires the court to first determine whether the defendant

4  violated a constitutional right, and then to determine whether that right was clearly

5  established.  Saucier v. Katz, 533 U.S. 194, 201-202 (2001).  In Pearson v. Callahan, 555

6  U.S. 223 (2009), the Supreme Court modified the Saucier test and "gave courts discretion

7  to grant qualified immunity on the basis of the 'clearly established' prong alone, without

8  deciding in the first instance whether any right had been violated."  James v. Rowlands, 606

9  F.3d 646, 650-51 (9th Cir. 2010) (discussing Saucier standard after Pearson).

10      The Court has concluded above that there was no constitutional violation pertaining

11  to Plaintiff's claims regarding the diagnosis and treatment of his HCV.  However, assuming

12  that Plaintiff was deprived of a constitutional right, the Court considers whether the right at

13  issue was clearly established.  The relevant, dispositive inquiry in determining whether a

14  right is clearly established is whether it would be clear to a reasonable officer that her or his

15  conduct was unlawful in the situation she or he confronted.  Saucier, 533 U.S. at 201-202.

16  In this case, the question is whether Defendants reasonably should have known that

17  selecting one course of medical treatment over another was unlawful.

18      In order to establish deliberate indifference regarding a choice of medical treatments,

19  the treatment Defendants chose for Plaintiff must have been medically unacceptable under

20  the circumstances and chosen in conscious disregard of an excessive risk to Plaintiff's

21  health.  See Jackson, 90 F.3d at 332.  Here, the chosen treatment was not medically

22  unacceptable under the circumstances because the HCV Guidelines specifically required

23  the exclusion from treatment of patients with Plaintiff's medical characteristics.  Although

24  the choice not to treat Plaintiff with combination therapy was a significant one, Defendants

25  have shown that a liver biopsy and combination therapy were considered and reviewed on

26  numerous occasions, and that their decisions were consistent with the Guidelines developed

27  in the Madrid class action lawsuit.  Therefore, reasonable medical professionals in the

28  circumstances faced by Defendants would not have believed that their decision to deny a

1  biopsy and antiviral therapy to Plaintiff was unlawful.  Defendants, therefore, are entitled to

2  qualified immunity on this claim.

3      The above notwithstanding, Defendants do not discuss qualified immunity with

4  respect to Plaintiff's claims regarding his diet and pain treatment.  As discussed above, the

5  Court has found that there are triable issues of fact which preclude summary judgment as to

6  these claims.  As such, summary judgment on qualified immunity grounds is likewise

7  inappropriate.  See Furnace v. Sullivan, 705 F.3d 1021, 1031 (9th Cir. 2013) ("disputed

8  issues of material fact in this case preclude summary judgment for the officers on the basis

9  of qualified immunity").

10      **G.    PRO SE PRISONER SETTLEMENT PROGRAM**

11      This case previously was referred to the pro se prisoner settlement program and it

12  did not settle.  However, in light of the Court's ruling and given the stage of the

13  proceedings, the parties now are in a better position to evaluate their respective cases for

14  purposes of settlement.  Therefore, good cause appearing, the case will be referred to

15  Magistrate Judge Nandor Vadas for settlement proceedings pursuant to the Pro Se Prisoner

16  Settlement Program.  The proceedings shall take place within sixty (60) days after the date

17  of this Order; or as soon thereafter as is convenient to the magistrate judge's calendar.

18  Magistrate Judge Vadas shall coordinate a time and date for a settlement proceeding with

19  all interested parties and/or their representatives and, within ten (10) days after the

20  conclusion of the settlement proceedings, file with the Court a report regarding the

21  settlement proceedings.[10]

22  **IV.    CONCLUSION**

23      To summarize, Plaintiff has failed to raise a triable issue of material fact regarding

24  his claims relating to the diagnosis and treatment of his HCV or against Defendants

25  Alpaugh and McClean.  However, there are triable issues of fact as to whether Nurse

26

27  _____

28  [10] In a separate order, the Court will refer this matter to the Federal Pro Bono Project
to appoint counsel to represent Plaintiff at the settlement conference.

Risenhoover, Dr. Sayre and Dr. Williams were deliberately indifferent in allegedly denying Plaintiff a hepatic diet and adequate pain medication.  Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's objections to Dr. Sayre's declaration are OVERRULED.

2.      Plaintiff's motion regarding interference with access to the Court is DENIED.

3.      Plaintiff's motion to compel discovery is DENIED.

4.      Defendants' motion to strike is GRANTED IN PART and DENIED IN PART, as set forth above.

5.      Defendants' request for judicial notice is GRANTED.

6.      Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Summary judgment is DENIED as to Plaintiff's hepatic diet and pain treatment claims, and is GRANTED as to all other claims, as set forth above.

7.      Dr. Wahidullah has answered the complaint, but was served after Defendants filed their motion for summary judgment.  To date, Dr. Wahidullah has not filed a dispositive motion in this case or informed the Court that he is of the opinion that the claims against him cannot be resolved through motion practice.  Therefore, the following briefing schedule shall govern Dr. Wahidullah's dispositive motion.

a.      No later than thirty (30) days from the date this Order is filed, Dr. Wahidullah shall file a motion for summary judgment or other dispositive motion.  The motion shall be supported by adequate factual documentation and shall conform in all respects to Federal Rule of Civil Procedure 56.  If Dr. Wahidullah is of the opinion that this case cannot be resolved by summary judgment, he shall so inform the Court prior to the date the summary judgment motion is due.  All papers filed with the Court shall be promptly served on Plaintiff.

b.      Plaintiff's opposition to the dispositive motion shall be filed with the Court and served on Dr. Wahidullah no later than thirty (30) days after the date on which Dr. Wahidullah's motion is filed.  The Ninth Circuit has held that the following notice should be given to pro se plaintiffs facing a summary judgment motion:

> The defendants have made a motion for summary judgment by which they seek to have your case dismissed.  A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.
>
> Rule 56 tells you what you must do in order to oppose a motion for summary judgment.  Generally, summary judgment must be granted when there is no genuine issue of material fact -- that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case.  When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says.  Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendant's declarations and documents and show that there is a genuine issue of material fact for trial.  If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you.  If summary judgment is granted [in favor of the defendants], your case will be dismissed and there will be no trial.

See Rand v. Rowland, 154 F.3d 952, 962-63 (9th Cir. 1998) (en banc).

Plaintiff is advised to read Rule 56 of the Federal Rules of Civil Procedure and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (party opposing summary judgment must come forward with evidence showing triable issues of material fact on every essential element of his claim).  Plaintiff is cautioned that because he bears the burden of proving his allegations in this case, he must be prepared to produce evidence in support of those allegations when he files his opposition to Defendants' dispositive motion.  Such evidence may include sworn declarations from himself and other witnesses to the incident, and copies of documents authenticated by sworn declaration.  Plaintiff will not be able to avoid summary judgment simply by repeating the allegations of his complaint.

c.      Dr. Wahidullah must provide the same warning required by Rand in his motion for summary judgment.  See Woods v. Carey, 684 F.3d 934, 935, 940-41 (9th Cir. 2012) (Rand warning must be given at the time motion for summary judgment is filed).

d.      If Dr. Wahidullah wishes to file a reply brief, he shall do so no later than thirty (30) days after the date Plaintiff's opposition is filed.

e.     The motion shall be deemed submitted as of the date the reply brief is due.  No hearing will be held on the motion unless the Court so orders at a later date.

8.     This action is referred to the Pro Se Prisoner Settlement Program, as indicated above.  The Clerk shall provide a copy of the court documents that are not available electronically, including a copy of this Order, to Magistrate Judge Vadas in Eureka, California.

9.     It is Plaintiff's responsibility to prosecute this case.  He must keep the Court informed of any change of address and must comply with the Court's orders in a timely fashion.

10.     Extensions of time are not favored, though reasonable extensions will be granted.  Any motion for an extension of time must be filed not later than fifteen (15) days prior to the deadline sought to be extended.

11.     The Order terminates Docket numbers 73, 100, 120 and 121.

IT IS SO ORDERED.

Dated: March 29, 2013

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

1  UNITED STATES DISTRICT COURT
   FOR THE
2  NORTHERN DISTRICT OF CALIFORNIA

3

4  RICK MADSEN,

5          Plaintiff,

6    v.

7  SUE E. RISENHOOVER et al,

8          Defendant.

9  _____/

10

11                                    Case Number: CV09-05457 SBA

12                                    **CERTIFICATE OF SERVICE**

13

14  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.

15
    That on April 2, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said
16  copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
    said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
17  located in the Clerk's office.

18

19

20  John Paul Rhode
    1000 G Street, Suite 200
21  Sacramento, CA 95814

22  Rick Madsen E10400
    Pelican Bay State Prison
23  P.O. Box 7500
    5905 Lake Earl Drive
24  Crescent City, CA 95531

25

26  Dated: April 2, 2013

27                                    Richard W. Wieking, Clerk
                                      By: Lisa Clark, Deputy Clerk
28
                                    - 36 -

1
2
3
4
5
6
7
8   G:\PRO-SE\SBA\CR.09\Masden5457.grantanddenyMSJ.docx
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28